UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>FUSION CONNECT, INC., *et al.*,<br><br>                  Debtors.<br><br> <br><br>UNITED STATES OF AMERICA,<br><br>               Plaintiff-Appellant,<br>     -v-<br><br>FUSION CONNECT, INC., *et al.*,<br><br>              Defendants-Appellees. | 20 Civ. 5798 (PAE)<br><br><u>OPINION &</u><br><u>ORDER</u> |

PAUL A. ENGELMAYER, District Judge:

    This appeal from a bankruptcy court ruling raises a pure question of law: whether a monetary penalty owed by a corporation as a result of a fraud on consumers is a dischargeable debt under 11 U.S.C. § 1141(d)(6)(A) where the creditor is a government entity that was not a victim of the fraud.

    Birch Communications Inc. ("Birch") defrauded consumers for years. In 2016, after a Federal Communications Commission ("FCC") investigation, Birch agreed to pay a $4.2 million civil penalty (the "FCC Penalty") to the United States. In 2018, Fusion Connect, Inc. ("Fusion") merged with Birch and assumed this liability. The next year, Fusion filed for reorganization under chapter 11 of the Bankruptcy Code, and sought to discharge the outstanding $2.1 million of the FCC Penalty. The Government argued that that liability was nondischargeable under 11 U.S.C. § 1141(d)(6)(A) because it arose from "money . . . obtained by . . . fraud." 11 U.S.C.

§ 523(a)(2)(A). However, the Bankruptcy Court disagreed, and found the FCC Penalty dischargeable. The Government has appealed that ruling.

For the following reasons the Court agrees with the Government that such a penalty is nondischargeable, and reverses the ruling of the Bankruptcy Court.

## I.      Background

### A.      Factual Background[1]

Birch was a common carrier authorized to provide local exchange service and long-distance telecommunications services. Dkt. 10, Ex. 1 ("App.") at 35; Bankr. Op. at 3. For years, to induce consumers to switch to Birch's services, Birch's telemarketers misrepresented their identities and the purpose of their calls. Bankr. Op. at 3. Birch also "billed consumers for unwanted services," "charged early termination fees for cancellation of Birch's services," "caused consumers to lose phone or internet service for extended periods," and "caused consumers—many of whom were small businesses—to expend significant time and effort to change service back from Birch's unwanted services to their prior telecommunications providers." *Id.*

In 2015, the FCC's Enforcement Bureau began to investigate Birch for deceptive and fraudulent practices. The agency reviewed hundreds of consumer complaints claiming, *inter alia*, that Birch's telemarketers, to induce consumers to switch to Birch, had misrepresented their identities and the purpose of their calls; that Birch had placed unwanted charges on their bills; and that Birch had levied large early termination fees on consumers who had tried to cancel the unauthorized service. *Id.* The FCC also investigated Birch's practices of "slamming" (changing

---

[1] The Court's account of the factual allegations is drawn from the Bankruptcy Court's Opinion, Dkt. 1, Ex. 1 ("Bankr. Op."), and from the record developed in that proceeding.

consumers' long-distance carriers without their authorization and without proper verification)
and "cramming" (charging consumers for long distance service and fees they had not
authorized). App. at 35.

On December 29, 2016, Birch and the FCC entered into a consent decree. Bankr. Op. at
3. It recited the FCC's findings that Birch's "cramming" had violated § 201(b) of the
Communications Act of 1934, 47 U.S.C. § 201(b), and that its "slamming" had violated section
258 of the Communications Act of 1934, 47 U.S.C. § 258, and FCC rules, 47 C.F.R. § 64.1120.
*Id.* at 4. Birch agreed to issue refunds to all consumers who had filed slamming and cramming
complaints during the two-year period covered by the investigation. *Id.* These refunds and
credits were to total at least $1.9 million. *Id.* Birch also agreed to pay a $4.2 million civil
penalty to the United States (the "FCC Penalty") in equal monthly installments over five years.
*Id.* By its terms, the consent decree bound Birch's successors, assigns, and transferees. *Id.*

After the consent decree, Birch issued the required $1.9 million in refunds and credits to
consumers. *Id.* at 4. Birch also began paying the FCC Penalty. *Id.*

In summer 2018, Fusion merged with Birch's parent company. That left Fusion as the
owner of Birch's business, and responsible for the outstanding FCC Penalty. App. at 4.

**B.    Fusion's Bankruptcy Proceeding**

On June 3, 2019, Fusion filed for reorganization under chapter 11 of the Bankruptcy
Code. As of that date, $2.1 million of the $4.2 million FCC Penalty had been paid; Fusion still
owed $2.1 million. *Id.*

On November 27, 2019, the FCC filed proofs of claim for the outstanding $2.1 million.
App. at 15; Bankr. Op. at 4. On December 17, 2019, the United States Bankruptcy Court for this
District entered a Confirmation Order. It confirmed Fusion's Third Amended Joint Chapter 11
Plan for reorganization. Relevant here, it stated that Fusion's continuing obligation for the

3

outstanding civil penalty "shall depend upon a determination of whether those obligations are dischargeable." Bankr. Op. at 4; App. at 15.

On January 17, 2020, the Government filed a complaint. It asserted that the outstanding FCC Penalty was not dischargeable, because it fell within the exception in the Bankruptcy Code for debts arising from fraud, 11 U.S.C. § 523(a)(2)(A). The Government noted that although the provision by terms applies only to bankruptcy proceedings involving individual debtors such as liquidation proceedings under chapter 7 of the Code, Congress, by enacting the Abuse Prevention and Consumer Protection Act of 2005, in 11 U.S.C. § 1141(d)(6) had extended it—in relevant part—to corporate debtors in chapter 11 proceedings. Bankr. Op. 3, 5.

On February 20, 2020, Fusion moved to dismiss. It argued that the FCC Penalty did not fall within the § 1141(d)(6) exception for liabilities arising from fraud, because Birch had not directed its fraudulent misrepresentations to the United States, and because the United States—unlike consumers—had not relied on Birch's misrepresentations or sustained loss as a result of them. *Id.* at 5, 2. Fusion separately argued that Congress's intent to discharge debts owed by corporate debtors to government regulators in chapter 11 proceedings was revealed by its failure to extend to those proceedings a separate provision of the Bankruptcy Code applicable to individual debtors, 11 U.S.C. § 523(a)(7), which provides for the nondischargeability of civil penalties owed to a government unit. *Id.*

On April 7, 2020, the Government opposed Fusion's motion to dismiss. It argued that § 523(a)(2)(A) covers any liability that arose from fraud, and was not limited to debts owed to the fraud victims, and thus applies to civil penalties arising out of fraud cases that are payable to the Government. *Id.* It further argued that the fact that Congress had not imported § 523(a)(7) to

4

chapter 11 bankruptcy proceedings does not bear on the meaning of § 523(a)(2)(A), as incorporated by § 1141(d)(6). *Id.*

On July 9, 2020, the Bankruptcy Court (Bernstein, J.) granted Fusion's motion to dismiss. The court did not accept Fusion's argument that Congress's not having incorporated § 523(a)(7) in chapter 11 bankruptcies bore on the meaning of § 1141(d)(6)(A). But the court agreed with Fusion that the exception to dischargeability for liabilities arising from fraud does not apply to the FCC Penalty because that exception does not reach debts owed to creditors who were not themselves defrauded. Because the victims of Birch's fraud consisted of consumers, and not the Government, the court held, "section 523(a)(2)(A), and hence section 1141(d)(6)(A), does not reach the FCC Penalty." Bankr. Op. at 12.

### C.    Procedural History of This Appeal

On July 27, 2020, the Government filed a notice of appeal in this Court of the ruling that the FCC Penalty was dischargeable, Dkt. 1, and, on August 11, 2020, designated the record on appeal. Dkt. 3. On August 12, 2021, the Court set a briefing schedule, Dkt. 4, which was later extended on request, *see* Dkts. 9, 15.

On October 14, 2020, the Government filed its opening brief. Dkt. 10 ("Gov't Br."). On December 4, 2020, Fusion filed a response. Dkt. 12 ("Opp'n"). On December 23, 2021, the Government filed a reply. Dkt. 16 ("Gov't Reply").

## II.    Jurisdiction and Governing Legal Standard

This Court has jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy courts pursuant to 28 U.S.C. § 158(a).

In reviewing final judgments by a bankruptcy court, a district court functions as an appellate court. *See In re CBI Holding Co., Inc.*, 529 F.3d 432, 448–49 (2d Cir. 2008). In exercising appellate review, a district court may "affirm, modify, or reverse a bankruptcy judge's

5

judgment, order, or decree." *In re DeFlora Lake Dev. Assocs., Inc.*, 629 B.R. 354, 358

(S.D.N.Y. 2021) (citations omitted).

Thus, the district court reviews the bankruptcy court's findings of fact for clear error

and its conclusions of law *de novo. In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988 (2d Cir.

1990); *see also* Fed. R. Bankr. P. 8013 (advisory committee note); Fed. R. Civ. P. 52(a)(6).

Here, the facts are undisputed, and, the parties agree, the Government's appeal presents a

pure question of law: whether a civil penalty payable to the United States arising out of a fraud

perpetrated against consumers constitutes a debt arising from "money . . . obtained by . . . false

pretenses, a false representation, or actual fraud" under 11 U.S.C. § 523(a)(2)(A), such that the

penalty is exempted from discharge in bankruptcy under 11 U.S.C. § 1141(d)(6). The Court

reviews this legal question *de novo.*

## III.    Discussion

The Court's analysis is in three parts. The Court first reviews the statutory framework in

which the provisions at issue here—11 U.S.C. §§ 523(a)(2)(A) and 1141(d)(6)—fit, and the key

precedent defining the reach of §§ 523(a)(2)(A): *Cohen v. de la Cruz*, 523 U.S. 213 (1998). The

Court next analyzes whether a debtor corporation's outstanding civil penalty to a regulator such

as the FCC Penalty is non-dischargeable under these provisions. The Court holds that it is, based

on the statutory text, as construed, *inter alia*, in *Cohen.* In this analysis, the Court considers, but

does not find persuasive, Fusion's contrary arguments, which are based on the common law of

fraud and on § 523(a)(7). Finally, the Court addresses why this holding aligns with the purposes

of the Bankruptcy Code.

### A.    The Statutory Framework

Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.*, allows corporations to

reorganize through bankruptcy. The chapter provides for confirmation of a bankruptcy plan that

"discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C.

§ 1141(d)(1). "The discharge of such claims serves the bankruptcy policy of providing debtors

with a 'fresh start' to permit their continued operation free of pre-bankruptcy debts." *DPWN*

*Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 150 (2d Cir. 2014).

      The instant appeal involves the reach of a statutory exception to discharge for debts

arising from fraud. In the context of individual debtors' bankruptcy proceedings, including

liquidation proceedings governed by chapter 7, the Code, through § 523(a)(2)(A), "has[]long

prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a

basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'"

*Cohen*, 523 U.S. at 217–18 (quoting *Grogan v. Garner,* 498 U.S. 279, 287 (1991)). Section

523(a)(2) thus excepts from discharge individual debtors' liabilities "sounding in fraud,"

"indicat[ing] that Congress intended the fullest possible inquiry to ensure that all debts arising

out of fraud are excepted from discharge, no matter what their form." *Archer v. Warner*, 538

U.S. 314, 321 (2003) (quotations omitted). Because—as explained below—Congress has

imported the relevant content of § 523(a)(2)(A) into chapter 11 proceedings via §1141(d)(6),

review of the statutory framework begins with § 523(a)(2)(A).

      **1.      Section 523(a)(2)(A), as Construed in *Cohen***

      In relevant part, § 523(a)(2) exempts from discharge "money, property, services, or an

extension, renewal, or refinancing of credit, to the extent obtained by—"

> (A) false pretenses, a false representation, or actual fraud, other than a
> statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A). Section 523(a)(2) thus exempts "debts traceable to falsity or fraud or

to a materially false financial statement." *Field v. Mans*, 516 U.S. 59, 64 (1995). As the

Supreme Court has explained, § 523(a)(2)(A) "continues the tradition" under the Code of

limiting relief to honest debtors, exempting from discharge an individual's debt "for money,

property, services, or an extension, renewal, or refinancing of credit, to the extent obtained

by . . . false pretenses, a false representation, or actual fraud." *Cohen*, 523 U.S. at 217–18 (citing

§ 523(a)(2)(A)).

The Supreme Court's decision in *Cohen* underscored the breadth of the debts that

§ 523(a)(2)(A) exempts from discharge.  At issue in *Cohen* was whether § 523(a)(2)(A) bars the

discharge of "treble damages awarded on account of the debtor's fraudulent acquisition of

'money, property, services, or . . . credit,' or whether the exception only encompasses the value

of the 'money, property, services, or . . . credit' the debtor obtains through fraud." *Id.*  The

debtor, Cohen, a residential property owner, been ordered by the Hoboken, New Jersey, Rent

Control Administrator to refund to his tenants $31,382.50 in excess rents, but had not complied

with the order, and later filed for relief under chapter 7, seeking to discharge his debts. *Id.* at

215.  The tenants filed an adversary proceeding against the debtor in Bankruptcy Court, arguing

that the $31,382.50 arose from rent payments obtained by "actual fraud" and that the debt was

therefore nondischargeable under § 523(a)(2)(A). *Id.*  The debtor's tenants also sought treble

damages and attorney's fees and costs pursuant to the New Jersey Consumer Fraud Act. *Id.*

Finding that the debtor had engaged in actual fraud and that his conduct fell within that statute,

the Bankruptcy Court awarded the tenants treble damages, plus reasonable attorney's fees and

costs. *Id.* at 215–16.  Further holding that all these debts "arose from rent payments obtained by

'actual fraud' and . . . w[ere] therefore nondischargeable under 11 U.S.C. § 523(a)(2)(A)," the

Bankruptcy Court held the awards of treble damages and attorney's fees and costs

nondischargeable under § 523(a)(2)(A).  The district court and the Third Circuit affirmed. *Id.*

The Supreme Court also affirmed.  It held the awards nondischargeable, finding that an award of "treble damages assessed on account of the fraud" fell within the scope of "'any debt' respecting 'money, property, services, or . . . credit' that the debtor has fraudulently obtained." *Id.* at 218 (quoting 11 U.S.C. § 523(a)(2)(A)).

The Court's analysis yielding this result was in two steps.  First, it considered whether the money sought "satisfies the threshold condition that it constitute a 'debt.'"  Second, it considered whether this "debt" fell within section 523(a)(2)(A)'s phrase "to the extent obtained by." *Id.* at 218–19.

As to the first question, the Court explained, "[a] 'debt' is defined in the Code as 'liability on a claim.'" *Id.* at 218 (quoting § 101(12)).  A "'claim' is defined in turn as a 'right to payment.'" *Id.* (quoting § 101(5)(A)).  And "a 'right to payment' . . . 'is nothing more nor less than an enforceable obligation.'" *Id.* (quoting *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 559 (1990)).  Thus, "a debt" "plainly encompass[es] treble damages:  An award of treble damages is an 'enforceable obligation' of the debtor, and the creditor has a corresponding 'right to payment.'" *Id.*

As to the second question, the Court explained, "the phrase 'to the extent obtained by' in § 523(a)(2)(A) . . . does not impose any limitation on the extent to which 'any debt' arising from fraud is excepted from discharge."  Rather:

> [T]o the extent obtained by" modifies "money, property, services, or . . . credit"—not "any debt"—so that the exception encompasses "any debt . . . for money, property, services, or . . . credit, to the extent [that the money, property, services, or . . . credit is] obtained by" fraud. The phrase thereby makes clear that the share of money, property, etc., that is obtained by fraud gives rise to a nondischargeable debt. *Once it is established that specific money or property has been obtained by fraud, however, "any debt" arising therefrom is excepted from discharge.*

*Id.* at 219–20 (emphasis added).  Thus, the Court concluded, the phrase "'[a]ny debt . . . for money, property, services, or . . . credit, to the extent obtained by' fraud encompasses *any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor*."  *Id.* at 223 (emphasis added).  As the Court elsewhere put the point: "§ 523(a)(2)(A) prevents the discharge of all liability arising from fraud."  *Id.* at 215.

### 2.       Section 1141(d)(6)(A)

As of 1998, when the Court decided *Cohen*, § 523(a)'s discharge exceptions applied only to individual debtors' bankruptcy proceedings.  However, seven years later, Congress extended § 523(a)(2)(A) to chapter 11 proceedings involving corporate reorganizations, when it passed the Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. § 1141(d)(6).  *See In re Hawker Beechcraft, Inc.*, 12 No. 11873 (SMB), 2013 WL 6673607, at *2 (S.D.N.Y. Dec. 18, 2013).

Section 1141(d)(6)(A) extends § 523(a)(2)(A) to such proceedings, by exempting from "discharge a debtor that is a corporation from any debt . . . of a kind specified in paragraph (2)(A) or (2)(B) of section 523(a) that is owed to a domestic governmental unit."  11 U.S.C. § 1141(d)(6)(A).  In extending the fraud discharge exception in § 523(a)(2) to corporate debtors in chapter 11 proceedings, Congress added only one limitation on the reach of § 523(a)(2)(A): that the creditor whose debt is excepted from discharge must be "a domestic governmental unit." *Id.*

*Cohen*'s construction of § 523(a)(2)(A)—including its broad construction of the statutory term "to the extent obtained by"—necessarily governs the construction of § 1141(d)(6)(A) in such proceedings.  As of 2005, *Cohen*'s construction of § 523(a)(2)(A), had been settled law for

seven years. And "Congress is presumed to be aware of a[] ... judicial interpretation of a statute." *Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978). Thus, when Congress extended § 523(a)(2)(A) to corporate debtors in chapter 11 proceedings without modifying the statutory text, Congress "is presumed . . . to [have] adopt[ed] that interpretation." *Id.*; *see id.* ("[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."); *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 457 (2015) (when Congress "rework[s]" a law part of whose text the Supreme Court has interpreted, without changing that text, that "further supports leaving the decision in place"); *Pierce v. Underwood*, 487 U.S. 552, 567–68 (1988) ("[O]nly the clearest indication of congressional command would persuade us to adopt a [reading of the statute] so out of accord with prior usage[.]").

Subject to the limitation that the creditor be "a domestic governmental unit," 11 U.S.C. § 1141(d)(6)(A)—as all agree is the case as to the United States, the creditor here—this Court thus treats *Cohen*'s construction of § 523(a)(2)(A) as governing the issue presented: whether the outstanding FCC Penalty is nondischargeable under § 1141(d)(6)(A).

### B.    Whether the FCC Penalty is Nondischargeable Under § 1141(d)(6)(A)

Whether the FCC Penalty is nondischargeable is distinct from the question presented in *Cohen*. At issue in *Cohen* were non-compensatory debts (treble damages, and attorney's fees and costs) owed to the same creditor who had been a victim of the fraud at issue. At issue here are non-compensatory debts (a civil penalty) owed to a creditor (the United States) who was not a victim of the fraud.

In analyzing this question, the Court nonetheless follows the two-step methodology employed in *Cohen*. The Court first inquires whether the FCC Penalty constitutes a "debt," and

11

then considers whether the penalty arises from money or property "obtained by fraud," as that requirement was analyzed in *Cohen*. *See* 523 U.S. at 218–19. The Court then considers Fusion's counterarguments.

### 1.    Is the FCC Penalty a "Debt"?

The answer to the first question is straightforward. The Bankruptcy Code's definitions "reflect Congress' broad view of the class of obligations that qualify as a 'claim' giving rise to a 'debt.'" *Id.* (quoting *Pa. Dep't of Pub. Welfare*, 495 U.S. at 559 (cleaned up). "Section 101(11) of the Bankruptcy Code defines 'debt' as a 'liability on a claim." *Pa. Dep't of Pub. Welfare*, 495 U.S. at 558. A "'claim' is defined in turn as a 'right to payment.'" *Cohen*, 523 U.S. at 218 (quoting § 101(5)(A)). "[A] 'right to payment' . . . 'is nothing more nor less than an enforceable obligation.'" *Id.* (quoting *Pa. Dep't of Pub. Welfare*, 495 U.S. at 559). Here, the FCC Penalty is an "enforceable obligation" on behalf of Fusion, and the FCC has a "right to [that] payment." *See id.* The FCC Penalty thus falls within "Congress' broad view of the class of obligations that qualify as a 'claim' giving rise to a 'debt.'" *Id.* (cleaned up).

### 2.    Does the FCC Penalty Arise From "Money . . . Obtained By Fraud"?

In *Cohen*, the Supreme Court concluded that § 523(a)(2)'s description of "'any debt . . . for money, property, services, or . . . credit, to the extent obtained by' fraud encompasses any liability arising from money, property, etc., that is fraudulently obtained." 523 U.S. at 223. In so reading that provision, the Court explained: "[the phrase] 'to the extent obtained by [fraud]' modifies 'money, property, services, or . . . credit'—not 'any debt.'" *Id.* at 218. Thus, "[o]nce it is established that specific money or property has been obtained by fraud, . . . 'any debt' arising therefrom is excepted from discharge." *Id.* The debt itself need not have been obtained by the fraud. *See id.* Rather, the Court "conclu[ded]," § 523(a)(2)(A) "bars the discharge of all liability

arising from fraud." *See id.* at 222; *see also Field*, 516 U.S. at 64 (describing § 523(a)(2)(A) as exempting from discharge "debts resulting from . . . actual fraud").

The Court further expanded on this point in *Archer*, 538 U.S. at 316.  There, the Court found that § 523(a)(2) covers "a debt embodied in a settlement agreement that settled a creditor's earlier claim 'for money . . . obtained by . . . fraud.'"  *Id.*  The Court held that even though the "settlement agreement d[id] not resolve the issue of fraud," *id.* at 317, a debt yielded by a settlement agreement "'arises' no less 'out of' the underlying fraud than a debt embodied in a stipulation and consent decree," *id.* at 321.

Lower-court decisions applying the Court's construction of § 523(a)(2) reinforce that to be nondischargeable, the debt need not be owed, either in whole or part, to a victim of the fraud, or represent compensation to such a victim.  For example, in *Pleasants v. Kendrick (In re Pleasants)*, 219 F.3d 372, 375 (4th Cir. 2000), the debtor, Pleasants, had falsely held himself out as a licensed architect and bungled the job for which the creditor, Kendrick, had contracted with him.  Kendrick brought a suit for damages; Pleasants then filed for bankruptcy.  Pleasants argued that Kendrick's claim against him did not fall under § 523(a)(2)(A), because that provision "requires that some portion of a creditor's claim must have been directly transferred from the creditor to the debtor," but "the [creditor's] claim included only amounts paid by the [creditor] to third parties, such as payments to the architect and builder hired to correct and complete the project."  *Id.*  The Fourth Circuit, however, held that the formulation and analysis in *Cohen* "is broad enough to encompass a situation in which no portion of a creditor's claim was literally transferred to the fraudulent debtor."  *Id.* (quoting *Cohen*, 523 U.S. at 215 ("We hold that § 523(a)(2)(A) prevents the discharge of *all* liability *arising from* fraud." (emphasis in original)), and *id.* at 218 (§ 523(a)(2)(A) bars "discharge of debts 'resulting from' or 'traceable

to' fraud" (quoting *Field*, 516 U.S. at 61, 64)). *See also Hatfield v. Thompson*, 555 B.R. 1, 12 (B.A.P. 10th Cir. 2016) ("[T]here is no requirement that the debt be for something the debtor obtains from the creditor.").

The FCC Penalty here similarly falls within the scope of the § 523(a)(2)(A) exemption, given the breadth of the Supreme Court's construction and description of the exemption in *Cohen*. Although the United States—the creditor as to the FCC Penalty—was not among the victims of Birch's fraud, and although that penalty is on top of the sums needed to make the victims (consumers) whole, those features of the penalty do not prevent the exemption from applying. *Cohen* made that clear, in holding exempt from discharge both the treble damages award and the award of attorney's fees and costs owed by the debtor, and in noting that liabilities exempted from discharge under § 523(a)(2)(A) "may exceed the value obtained by the debtor." 523 U.S. at 223.

As to the test imposed by *Cohen* deriving from the text of §523(a)(2)(A)—whether the debt in question arises from "specific money or property [that] has been obtained by fraud," *id.*—the more persuasive conclusion is that the FCC Penalty does so. To be sure, the treble damage award in *Cohen* arose from specific fraud proceeds with mathematical precision, insofar as that award was literally a derivative (3x) of the damages (excess rent) found by the Administrator. The same, however, cannot be said of the fee and cost award in *Cohen*, which was based on the Bankruptcy Court's assessment of the reasonable fees and costs the tenants incurred in litigating before the Administrator, and which the Supreme Court also treated as resulting from money obtained by fraud and hence exempt. *See id.*

Critically in this Court's analysis, the Supreme Court's repeated descriptions in *Cohen* of the scope of the debts that § 523(a)(2)(A) makes nondischargeable once it has been determined

that money or property has been obtained by fraud are striking in their breadth.  The Court stated that: "Once it is established that specific money or property has been obtained by fraud, . . . '*any debt*' *arising therefrom* is excepted from discharge." *Id.* at 218–19 (emphasis added).  And the Court twice keyed the debts nondischargeable under § 523(a)(2)(A) to those *traceable to the fraud.*  The Court added: "When construed in the context of the statute as a whole, then, § 523(a)(2)(A) is best read to prohibit the discharge of *any liability* arising from a debtor's fraudulent acquisition of money, property, etc[.]" *Id.* at 220–21 (emphasis added); *see also id.* at 221 (noting that same provision also exempts liability for punitive damages).  Lest the breadth of this formulation be discounted as inadvertent, the Court in *Cohen* later reiterated the point, stating: "§ 523(a)(2)(A) bars the discharge of *all liability arising from fraud.*" *Id.* at 222 (emphasis added).

Measured against the Supreme Court's repeated account of the exemption as extending to all liabilities arising from the fraud, the FCC Penalty is properly held nondischargeable.  It is undisputed that specific money was obtained by Birch by fraud; on this basis, the consent decree required Birch to repay consumers at least $1.9 million.  And the additional FCC Penalty, as the consent decree recites, was "assessed on account of [Birch's] fraud," *id.* at 218.  The FCC Penalty thus qualifies as a debt "arising therefrom" the fraud, *id.*, as a "liability arising from a debtor's fraudulent acquisition of money," *id.* at 221, and as a "liability arising from fraud," *id.* at 222; *see also Field*, 516 U.S. at 61 (exemption reaches debts "traceable to" fraud).  The Court accordingly holds that the FCC Penalty fits within the § 523(a)(2)(A) exception to dischargeability, as analyzed in *Cohen,* and as extended to chapter 11 corporate debtors through § 1141(d)(6)(A).

15

### 3.    Fusion's Counterarguments

Fusion makes two counter-arguments.  Neither carries the day.

***Common law elements of fraud***:  Fusion first argues that the FCC Penalty should be held dischargeable because its predecessor Birch's offense does not fit the common law elements of fraud.  Fusion is correct that § 523(a)(2)(A), in using terms such as "fraud," has been construed "to incorporate the general common law of torts." *Field*, 516 U.S. at 70 & n.9.  "The elements of actual fraud under Bankruptcy Code incorporate the general common law of torts and likewise include a false representation, scienter, reliance, and harm." *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006) (citing Restatement (Second) of Torts § 525 (1977)); *see also Field*, 516 U.S. at 70 (The "most widely accepted distillation of the common law" elements of fraud is from "the Restatement (Second) of Torts (1976).").

Here, however, the elements of "actual fraud"—false representation, scienter, reliance, and harm—were clearly met as to the consumers Birch defrauded, a point which Fusion does not seriously dispute.  As the consent decree and the Bankruptcy Court each recited, Birch made false *representations* to consumers, with *knowledge* of the statements' falsity and with the intent to deceive consumers.  *See* Bankr. Op. at 3 ("For years, Birch telemarketers misrepresented their identities and the purpose of their calls to consumers to induce them to switch to Birch's services.").  As these sources further recite, Birch's unwitting consumers justifiably *relied* on Birch's false statements and suffered pecuniary *loss* as a result.  *See id.* (describing how Birch telemarketers intentionally led consumers to misunderstand the services Birch offered, so as to persuade consumers to switch to Birch's service; and describing how Birch then "billed

consumers for unwanted services," "charged early termination fees for cancellation of Birch's services," and "caused consumers to lose phone or internet service for extended periods").

Fusion argues, however, that for § 523(a)(2) to apply to a particular debt, not only must the debtor have committed "actual fraud"—the "actual fraud" must have been directed at the creditor holding that debt, as was not the case with respect to the United States. *See* Opp'n at 23 (noting that the Complaint does not show "a misrepresentation to the FCC, an intent to deceive or induce reliance by the FCC, actual reliance by the FCC, and any pecuniary loss suffered by the FCC"). This, Fusion contends, distinguishes *Cohen*, in that the treble damages and fee and cost awards at issue there were payable to the victim consumers. *Id.* at 22.

Neither the statutory text nor the case law construing § 523(a)(2)(A), however, requires that the common law elements of fraud must be met both as to the fraud and as to the creditor holding a debt arising from the fraud. And the statutory text as glossed in *Cohen* decouples in sequence the fraud and debt issues, requiring, as noted, that there have been "a liability arising from fraud," 523 U.S. at 522.[2] Nothing in *Cohen* suggested that a debt to a third-party creditor fell outside the scope of the exception. And *Cohen*'s holding that § 523(a)(2)(A) exempts treble damages and attorneys and costs is in some tension with Fusion's notion that nondischargeability is limited to damages available for fraud at common law. *Cf. PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 405 (2003). There is, therefore, no support for Fusion's construction, either

---

[2] As to the scope of the frauds covered by the exception, the Supreme Court has emphasized that the term "actual fraud" is to be read broadly: "[A]nything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'" *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).

in the text of § 523(a)(2)(A)—or § 1141(d)(6), extending § 523(a)(2)(A) to chapter 11

proceedings involving corporations—or the central precedent construing the exception.

Fusion notes that several courts have described § 523(a)(2)(A) using language suggesting

that the common law fraud elements of fraud were required to be met as applied to the creditor of

the debt at issue. Opp'n at 24.[3] But that formulation of the § 523(a)(2)(A) test—implying that

what is required for nondischargeability is a false statement to the creditor, intent to deceive the

creditor, and reliance by the creditor to his or her detriment—does not follow from the text of the

statute. *See Stallworth v. McBride* (*In re McBride*), 512 B.R. 103, 112 (Bankr. D. Mass. 2014)

(rejecting this "narrow . . . construction"). And a review of these cases reflects that in each, the

creditor at issue was a victim of the fraud. This suggests that that formulation was used as

shorthand, not to opine on the question—not presented by those cases—whether debts owed to a

creditor who was not a victim of the fraud fell outside the scope of § 523(a)(2)(A).

Fusion also points to one decision, from a bankruptcy court, involving non-victim

creditors which found that § 523(a)(2) required the fraud be "as applied to the creditor itself."

Opp'n at 24; *see In re TK Holdings Inc.*, 17 No. 11375 (BLS), 2018 WL 903980, at *7 (Bankr.

D. Del. Feb. 14, 2018), *vacated on other grounds*, 2018 WL 7051669 (Bankr. D. Del. Apr. 9,

2018) ("But if the fraud is perpetrated not upon the government but on citizens and consumers,

the requirements of § 523(a)(2) are not satisfied."). But that decision did not address, or even

cite, *Cohen*, whose construction of § 523(a)(2)(A) is foundational.

In contrast, the two other bankruptcy courts to have addressed that question in the context

of judgments due to government entities who were not victims of the fraud did look to *Cohen* for

---

[3] These courts are *Field*, 516 U.S. at 75–77 and *Husky*, 136 S. Ct. at 1586. Fusion also cites to a
bankruptcy treatise for support, 8 Collier § 1141.05(b)(i), Lexis (16th ed. updated 2020).

guidance. Each held, in the context of a chapter 7 and 13 proceeding respectively, that a debt

owed to a government entity creditor was nondischargeable under § 523(a)(2)(A) where the

common-law elements of fraud had been satisfied as to the consumer victims of the fraud. *See In*

*re Garner*, 515 B.R. 643, 649 (Bankr. M.D. Fla. 2014) (holding nondischargeable award payable

by debtor to State of Texas for violating Texas Consumer Protection Acts; common-law

elements of fraud satisfied where debtor had "made false misrepresentations intended to deceive

consumers," "[t]he consumers reasonably relied on" these representations, and as a result,

"sustained losses"); *see id.* ("Restitution awarded under state consumer protection statutes often

is deemed nondischargeable under section 523(a)(2)(A) because those statutes aim to recoup

consumer losses resulting from misrepresentation and deceptive trade practices."); *In re Audley*,

268 B.R. 279, 282–84 (Bankr. D. Kan. 2001), *aff'd*, 275 B.R. 383, 386, 388–89 (B.A.P. 10th Cir.

2002) (holding that the common-law "elements of proof required by § 523(a)(2)(A)" were

satisfied where the fraudster had "knowingly and intentionally" falsely represented to only

"customers" and where only customers "justif[iably] . . . reli[ed] on the misrepresentations" and

"suffered a loss").

      Further undermining Fusion's argument are decisions by the Eleventh and Third Circuits

holding that § 523(a)(2)(A)'s requirement of a fraud consistent with the common-law elements

of fraud is satisfied where the defrauded party or parties were person(s) other than the creditor in

the bankruptcy proceeding. The creditor in each case was the Securities and Exchange

Commission ("SEC"), pursuing disgorgement. In *In re Bilzerian*, 153 F.3d 1278, 1280 (11th Cir.

1998), the debtor, Bilzerian, faced a civil judgment for securities fraud "requiring [him] to

disgorge fraudulently obtained profits" to the SEC. The Eleventh Circuit held the elements of

fraud were met "because Bilzerian's criminal conviction for securities fraud established that he

made a false statement on which a reasonable investor would have relied," and investors

"*were* injured by Bilzerian's deceptions—investors paid Bilzerian an inflated price for his stocks

because of his illegal actions." *Id.* at 1282–83. Thus, the Eleventh Circuit held, "the

requirements for application of 11 U.S.C. § 523(a)(2)(A), which excepts from discharge in

bankruptcy debts for money obtained by fraud," were satisfied, even though the fraud had not

been directed at the SEC. *Id.* at 1280. Similarly, in *In re Bocchino*, the SEC had secured two

civil judgments for disgorgement against the debtor, Bocchino, "for two private placement

investments he solicited . . . via high pressure sales tactics and material misrepresentations." 794

F.3d 376, 378 (3d Cir. 2015). The Third Circuit held those judgments nondischargeable because

the elements of fraud had been met as to Bocchino's clients, as to whom Bocchino had been "the

proximate cause of [their] losses," even though the fraud had not been directed at the SEC. *Id.* at

382–83.[4]

Fusion next relies on *In re Exide Techs.*, 613 B.R. 79, 81 (D. Del. 2020), on which the

Bankruptcy Court below also relied. *See* Bankr. Op at 10–12; Opp'n at 18–19. After Exide

Technologies filed a voluntary petition under chapter 11, a state regulatory agency, "the

District," filed a claim for more than $38 million in penalties related to Exide Technologies'

---

[4] Fusion seeks to distinguish these disgorgement cases, on the ground that "disgorgement
damages [are] a *compensatory* penalty based on the amount obtained through fraud." Opp'n at
33–34. That factual distinction indeed appears to exist, insofar as the FCC Penalty imposed by
the consent decree does not state that it is compensatory. (The record is, however, less than
pellucid as to what the FCC Penalty represents; as the Government explains, the FCC does not
have a free-standing statutory or regulatory basis "to require 'disgorgement' as a remedy," Dkt.
20, and thus the purposes served by a penalty imposed by the FCC in a consent decree may serve
purposes including disgorgement of ill-gotten gains from the wrongdoer where the agency has
been unable to identify a clear victim to compensate.) Regardless, *In re Bilzerian* and *In re
Bocchino* each hold that, provided that the elements of common-law fraud are otherwise met,
they need not be met as to the creditor in question. Neither case turned on the compensatory as
opposed to punitive character of the debt.

operation, in violation of air quality emissions standards, of a lead battery recycling facility. The Bankruptcy Court held dischargeable the penalties that the District sought, *In re Exide Techs.*, 601 B.R. 271, 280–84 (Bankr. D. Del. 2019), *aff'd*, 613 B.R. 79, and the district court affirmed. But *Exide* is easily distinguished from this case because it did not involve underlying fraudulent conduct. The creditor had failed to timely assert that Exide had committed a fraud, as required by § 523(a)(2)(A), *see Exide*, 613 B.R. at 87. Indeed, the creditor failed to demonstrate that *any* party had been defrauded by the debtor, and thus that the penalty could be a liability "arising from fraud." *Id.* at 88 ("The regulations that authorize[d] the Original Penalties are not based on fraud."). Because there was no third-party fraud victim, the Bankruptcy Court in *Exide* was not presented with the question at issue here: whether a penalty arising out of common-law fraud is dischargeable because it was perpetrated on a third party.

To be sure, in dicta, the *Exide* court added that, "[e]ven assuming that the District had timely asserted claims including allegations of misrepresentation or fraud," the penalty at issue would not fall within § 523(a)(2)(A)'s discharge exemption. *Id.* at 87. But that dicta addressed a scenario different from that here. The Bankruptcy Court's basis for stating that the discharge exemption would not apply was that the District's "claim did not satisfy a prima facie element of fraud: that a creditor sustained loss and damages as a proximate result of the misrepresentations having been made." *Id.* (quoting *Exide*, 601 B.R. at 282). And no other party was alleged to have sustained loss and damages as a result of the misrepresentations. Thus, the common law fraud requirements of loss and causation were not satisfied as to any party. The civil penalties instead were "noncompensatory penalties for . . . strict liability violations" of air quality emission standards. *Id.*

21

In a final argument along these lines, Fusion urges that § 523(a)(2)(A) be limited to the context where the creditor was itself a victim of fraud because so far "*all* of the Supreme Court's cases construing section 523(a)(2)(A) have considered the provision in the context of a creditor as the victim of fraud." Opp'n at 28. That argument does not logically follow. The fact that a particular application of a statute has yet to result in a case worthy of a grant of *certiorari* does not mean the application is outside the scope of the statute.

*11 U.S.C. § 523(a)(7)*:  Fusion's final argument is that § 523(a)(7), not § 523(a)(2), dictates the outcome in this case. *See* Opp'n at 16. Section 523(a)(7) exempts an individual debtor's debt from discharge "to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty." 11 U.S.C. § 523(a)(7). It bars an individual debtor from discharging non-compensatory fines owed to the Government, whether or not based on fraudulent conduct. The FCC Penalty owed to the United States here was such a fine. Fusion notes, however, that because § 523(a)(7) is limited to individual debtors, which Fusion is not, § 523(a)(7) does not exempt the FCC Penalty from discharge. Fusion argues that because—in contrast to its treatment of § 523(a)(2)(A)—Congress did not extend § 523(a)(7)'s discharge exception to corporations, Congress should be viewed as having intended that penalties such as the FCC Penalty be dischargeable. *See* Opp'n at 17.

The short answer is that Congress's inaction with respect to extending § 523(a)(7) to corporate debtors does not bear on the application of § 523(a)(2)(A)—as extended to corporate debtors by § 1141(d)(6)(A)—to penalties of the character of the FCC Penalty. Fusion objects that construing the FCC Penalty as nondischargeable under § 523(a)(2)(A) would create an overlap, in that, as to individual debts taking the form of penalties to government entities arising

22

from fraud, both §§ 523(a)(2)(A) and 523(a)(7) apply.  Fusion posits that the Bankruptcy Code does, or ought, not permit such overlap, lest one section be rendered superfluous.  Fusion further argues that any tension between these sections should be resolved its favor, with Congress's inaction in not extending § 523(a)(7)(A) to chapter 11 proceedings, carrying the day, so as either to dictate, or override, the Court's construction of § 523(a)(2)(A).

Fusion is wrong.  Statutory overlaps happen.  As the Supreme Court has noted in the very context of § 523 of the Bankruptcy Code, there are some sections for which "[t]here is, in short, overlap, but that overlap appears inevitable." *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1588 (2016).  Such is the case here.  And reading § 523(a)(2)(A) to cover civil penalties arising out of fraud that are due a government creditor does not make superfluous one of the two provisions within § 523(a).  It merely creates a "narrow redundanc[y] in § 523" of the sort that that "appear unavoidable." *Id.*  For example, in *Husky*, the Court explained that its interpretation of "actual fraud" in § 523(a)(2)(A) "preserves meaningful distinctions between that provision and §§ 523(a)(4) [and] (a)(6)," even though under certain circumstances fraudulent conveyance schedules could fall under all three sections. *Id.* ("§523(a)(4), for instance, covers only debts for fraud while acting as a fiduciary, whereas § 523(a)(2)(A) has no similar limitation[.]").

Similarly, here, a Venn diagram assessment of the coverages of §§ 523(a)(2) as construed here and § 523(a)(7)) yields a narrow overlap: with respect to non-compensatory penalties owed to government entities by individual debtors arising out of fraudulent conduct.  But there remain "meaningful distinctions" between the sections.  Section § 523(a)(2) covers all debts arising from fraud, including, significantly, the vast body of debts that are not owed to the Government.  And § 523(a)(7) covers all debts in the form of non-compensatory penalties payable to governmental units, including those that have nothing to do with fraud, such as the penalty for air-pollution

violations addressed in *Exide*. Thus, as the Sixth Circuit and other courts have noted, § 523(a)(2) and § 523(a)(7) need not be read as mutually exclusive to avoid making one or the other superfluous. *See, e.g., Andrews v. Mich. Unemp. Ins. Agency*, 891 F.3d 245, 251 (6th Cir. 2018).

Finally, to the extent Fusion argues that § 1141(d)(6)(A)'s construction should be shaped by Congress' decision to import § 523(a)(2)(A) but not § 523(a)(7) to chapter 11, that is also wrong. Congress's decision to extend to chapter 11 proceedings only the § 523(a)(2) exception does not mean that—as to the subset of debts mutually covered by it and § 523(a)(7)—§ 1141(d)(6)(A) has a narrower reach than does its progenitor, § 523(a)(2)(A). At the time that Congress enacted § 1141(d)(6)(A), § 523(a)(2) had an established meaning, including based on the analysis in *Cohen*, as reviewed above. That meaning, not inferences drawn from Congress's inaction as to a separate and only partly overlapping provision, § 523(a)(7), controls as to § 1141(d)(6)(A)'s construction. *See Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1015 (2017) ("'[C]ongressional inaction lacks persuasive significance' in most circumstances." (quoting *Pension Benefit Guaranty Corporation v. LTV Corp.*, 496 U.S. 633, 650 (1990)); *Burns v. United States*, 501 U.S. 129, 136 (1991) ("An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent."); *United States v. Wells*, 519 U.S. 482, 496 (1997) ( "[W]e have frequently cautioned that it is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law[.]" (cleaned up)).

And here, that Congress specified in § 1146(d)(6)(A) that that section would apply to debts "owed to a domestic governmental unit" firmly underscores Congress's intend that the standards of § 523(a)(2)(A) *would* apply to such debts.

24

### E.   Policy Implications

The parties, finally, take opposite views as to whether exempting corporate debts of the character of the FCC Penalty accords with the goals of the Bankruptcy Code as reflected in the case law. The Government's view is far the more persuasive.

Fusion argues that preventing it from shedding the FCC Penalty in connection with its liquidation would saddle the stakeholders of the reorganized entity with "the burden of Birch's wrongdoings that occurred even prior to Fusion's acquisition of the company." Opp'n at 44. That argument is unusually unpersuasive. Fusion's stakeholders knowingly took on Birch's preexisting liability to the United States arising from its fraud on consumers and consequent consent decree with the FCC. And the reorganized company's stakeholders similarly were on notice that such a liability could attach to the newly constituted entity, including based on the Confirmation Order issued by Judge Bernstein in December 2019, which put them on notice that whether the FCC Penalty was dischargeable was an open issue. A stakeholder in the new company thus had their eyes open that that liability, like other continuing liabilities or business costs and risk, might live on.

Moreover, a contrary statutory construction would unsettle an agreement negotiated at arms-length with a fraud regulator and carry problematic incentives, as the Government notes. *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972) (where there is an "arm's-length negotiation by experienced and sophisticated [parties], . . . absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts"). Birch knowingly entered into the consent decree that imposed the FCC Penalty, terminating an agency investigation. Fusion, in turn, knowingly acquired Birch's business line subject to that obligation. And the FCC, in determining the terms on which it was prepared to settle with Birch, presumably expected Birch (or its successors or assigns) to abide by this commitment, which

presumably was material to its decision to settle rather than continue to investigate, bring more muscular enforcement action, and/or sue. Had the FCC appreciated that the fraud penalty would eventually be dispensable, the agency might have otherwise structured the consent decree to avoid this result. Rather than permitting payout in stages over years, it might, for example, have insisted on more onerous terms, such as requiring immediate payment of the FCC Penalty; that outcome potentially could have had dire consequences for corporate survival, and even provoked bankruptcy. Or the FCC might have demanded personal guarantees of the FCC penalty by corporate executives.

And a statutory construction permitting a company—or its assignee—to shed a regulatory fraud penalty in this manner could invite mischief. For example, it might incent the strategic offloading of such a liability onto a successor entity primed soon to file for reorganization under chapter 11. The risk of such mischief may be all the greater given that the company—as here, and by definition under § 1141(d)(6)(A)—had a recent history of fraud. And courts have warned against interpreting the Code in a manner that would create perverse incentives for debtors that do not align with the Code's purposes. *See, e.g.*, *In re Murphy*, 282 F.3d 868, 874 (5th Cir. 2002) (declining to adopt interpretation of § 523(a)(8) that "would create perverse incentives for student borrowers, squarely at odds with the only purposes that Congress has ascribed"); *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 937–38 (1st Cir. 1995) (declining to "constru[e] [a] term" that "would create a perverse incentive for educational debtors" by "encourag[ing] debtors to circumvent nondischargeability provisions" because such a "result clearly would be in conflict with the legislative goals manifested in Section 23(a)(8)"); *KeyBank Nat'l Ass'n v. Franklin Advisers, Inc.*, 600 B.R. 214, 231 (S.D.N.Y. 2019) (declining to "adopt[] a rule that would . . . create perverse incentives for the parties to engage in delay and gamesmanship in both the

26

bankruptcy reorganization and the related litigation" (quoting *In re WorldCom, Inc. Sec. Litig.*, 294 B.R. 553, 557 (S.D.N.Y. 2003)).

For these reasons, the Court's holding here—construing the civil fraud penalty as not dischargeable under § 1141(d)(6)(A)—is not only the more faithful to the statutory text, but also the one most in line with the historical Bankruptcy Code policy of "affording relief only to an honest but unfortunate debtor." *Cohen*, 523 U.S. at 217–18 (quotations omitted); *see also Archer*, 538 U.S. at 321 ("Congress intended the fullest possible inquiry to ensure that all debts arising out of fraud are excepted from discharge, no matter what their form." (quotations omitted)).

## CONCLUSION

For the foregoing reasons, the Court holds that the FCC penalty is nondischargeable, and reverses the decision below.  The Clerk of Court is respectfully requested to close the motion pending at Docket 6.  The Court remands this matter to the Bankruptcy Court, for proceedings consistent with this decision.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: September 2, 2021
New York, New York